Thank you, Chief Judge Thomas, and may it please the Court, my name is Eric George, and I'm here on behalf of the plaintiffs and appellants. I would like to take 15 minutes and then have 10 minutes go to the Deputy Solicitor General who's here, Amy Feinberg, and then save 5 minutes for rebuttal. And to begin, Your Honors, if I can add a little perspective on the law that's at issue here, there are two fundamental points that I'd like to make. Number one, although the very purpose of Dormant Commerce Clause jurisprudence is to stem protectionism, to address instances where instators are made to benefit at the expense of out-of-staters, number one, there is zero discrimination of any sort imposed by the Resale Royalty Act here. There's no penalization against out-of-state interests. There's no in-state favoritism. And the second point I'd like to make is that at no time since its 1976 enactment has this Act purported to or in any way had the effect of regulating price, the terms of a sale, the conditions of a sale. All that this enactment has done is require that a California resident, either directly or through his agent or her agent, pay a certain levy on certain profitable art sales. That's it. We know that in the context of Dormant Commerce Clause labels don't matter. Complete auto tells us we look past the label and nomenclature. But if we look at this as a regulation or as a tax, the Act readily passes muster. Let me focus on why that's so for regulation. Any regulation that's nondiscriminatory and does not involve price controls or tie in-state and out-of-state prices is not reached by Healy. The Supreme Court told us that in Walsh in 2003. This Court has told us that same thing. I'm not going to give the French pronunciation, but in the Foie Gras case, that has been a constant. My understanding is that there are various strains of Dormant Commerce Clause jurisprudence, and some of them are sort of black letter and some of them are fuzzier and balancing and so on. But from Healy and before Healy and in terms of this Court's jurisprudence, actually and directly regulating an out-of-state transaction, and you can argue about whether that's what's happened here, but it is a Dormant Commerce Clause violation, regardless of whether it favors or disfavors the in-state or the out-of-state people, that you just can't enact a law that regulates an out-of-state transaction. Is that wrong? That is wrong, Your Honor, with all respect. Why? It takes more than that. It takes either discriminatory law or it has to involve actual prices. For example, each of the ---- I could pass a law that says that in New York, anybody who sells X in New York has to do Y. Yes. California could pass such a law and that would not be a Dormant Commerce Clause problem. Ah, no, to be sure. I appreciate the clarification. The language of Healy has a very important adverb in it. The regulation has to be wholly outside of the state in order for it to be extraterritorial and impermissible. So if someone buys and sells in New York, to use Judge Berzon's example, even if one party is from Paris and the other party is from another state, it's your view that the other state, whichever that may be, California, Ohio, whatever, can regulate that sale that takes place in New York? The answer for that would be complete auto, and there would be a four-part test. It's a yes or no. Complete auto is maybe a reason, but can the state regulate the New York transaction merely because either the buyer or the seller is from the state that seeks to regulate? No. For a tax, there has to be more, and that's why I mentioned complete auto. But it would certainly be indispensable in order to get to the next step that the tax has got to be more. So let's – look, I want to stay with that point. Let's assume we view this as a tax because in terms of its incidence on interstate commerce, it appears to me to be exactly the same as a sales tax imposed on gross receipts. Is there any case you can cipher the proposition that California can consummate a sale of goods made in – can tax the consummation of a sale of goods in another state? I think the closest we have is Quill, a national geopark. Quill is a use tax. Yes. I'm talking about a sales tax. We're talking about sale of goods. So you're not – this is not a use tax. You're not taxing the enjoyment of the art in California because, as Judge Graber points out, you reach a transaction where the art's never, ever been in California. So is there any case that you can cite where a sales tax on a sale consummated in a different state than the state imposing the tax has been upheld? I don't know the answer to that, Your Honor. Didn't the Supreme Court say in the Oklahoma case that only Oklahoma could tax the sale of the ticket? Well, I don't know, and I think that in the context of current tax law, we'd have to look at complete auto and any case that follows that regime. So under complete auto, do you think that it would be legal for California to tax the sale of goods made by a California resident to a New York resident if the sale of goods occurred in California – in New York, sorry? In this case, yes, and I will elaborate why. Because you don't just have a Californian who is the seller of the art. You also have an agent who happens to be a California resident. And let's recall, we've got three defendants here. One is a California domiciliary. The other two have a substantial presence in California. So I believe that, yes, under that circumstance, a tax would be appropriate. You do agree that the statute reaches circumstances where those facts aren't necessary? Where those facts are not necessary. Are not necessary. The statute on its face reaches a circumstance where a California resident, as Judge Graber suggests, owns an apartment in New York, has a piece of art in it, sells it to a New York buyer. Statute imposes the royalty under those circumstances, too, does it not? It does. And if I can elaborate, Your Honor, because I think this is a very important distinction. First of all, the three auction house defendants here are not able to raise constitutional or tax arguments outside of, let's say, a First Amendment context on behalf of others. So really what we're looking at for purposes of this challenge are three defendants, three defendants only, each of which would be deemed a California resident. And under that context, Californian who is the seller, a Californian who is the auction house, the auction house being an agent by contract with the particular seller, there ought not be a problem whether we look at it as a tax or a regulation. In what case can you cite for the proposition that California can impose a sales tax under those circumstances? Your Honor, I can't. And part of my problem is that this is not a sales tax, of course, because a sales tax is paid by the purchaser and this is a tax or a levy or royalty, whatever we call it, that's imposed by the seller. Counsel, you seem to be assuming that this is a tax. Does your case turn entirely on whether or not we agree with you that this is a tax? Not at all, Your Honor. And I think first and foremost I do look at it as a regulation, albeit one that requires the payment of some monies. As a regulation, the point that I want to emphasize is that HEALE does not reach nondiscriminatory regulations unless they involve price tying, price controls of some sort. Unquestionably, this does not. That's why I began where I began, and that can't be right. I mean, even though HEALE has broader statements than that, but it can't be that even if it doesn't affect price, I can pass a statute saying what two people can do in a transaction in New York, even including a California resident. Yes, Your Honor. You keep overstating that and therefore misleading us. I mean, whatever HEALE, whether HEALE – HEALE certainly has sentences that seem that broad. The facts were not that broad, but there can't be any doubt that that's the case. Justice Brezina, I certainly don't want to mislead or do anything that would be construed as misleading. The language of HEALE requires that the transaction be wholly out of state in order to be extraterritorial. Well, if the transaction is wholly out of state. There's a person involved who is a California resident, but the transaction is wholly out of state. Mr. George. Yes. Go ahead. Finish with Judge Brezina. Your Honor, I would take issue with that, Your Honor, for the reason as follows. Every single time that this Act is applied, it involves a California resident seller.  But, counsel, suppose there's a non-California auction house, a purely local auctioneer in New York, no California connections. You would assert, I assume, that the statute would apply even to that sale. Not necessarily. That's a much more tricky situation, Your Honor, because there the tax laws, for example, the cases of Quill, excuse me, Quill, the National Geographic, wouldn't provide the necessary nexus. On the other hand, if this is still looked at as a regulation and we know that the selling party is a Californian, then there may be a sufficient nexus. But I want to emphasize, that is not our case here. We're dealing with three auction houses, all of which are California residents. I'm trying to figure out, Mr. George, what the Court would have to find in order for your position to prevail. And I'm seeing two avenues that you're going. And one would be confining the bar on extraterritorial state legislation to price-fixing statutes. And the other is to designate this as a tax. Are those your two avenues, or am I making it narrower than your position? Your Honor, it can be either or, truly. And I'm going to state it right this time. We take the language of Healy, and we recognize that this is a nondiscriminatory statute that does not apply wholly outside of California. Because it doesn't involve price tying or price controls, it is appropriate. Can I ask you about that first part? You say it doesn't apply wholly outside of California. I take it that's because the auction houses are California residents, even though they do nothing in California in any particular case? Well, we don't know if they do or don't. But you do contend that it would apply to them had they done nothing in California. In other words, the California resident who had an apartment in New York sought out Christie's or eBay and said, would you conduct an auction for me in New York, you would contend the statute applied, would you not? I would, Your Honor, because that would be the resident of California saying, I want to engage you as my agent to perform the sale for me. Let's assume that this all occurs extraterritorially. Yes. The person lives in New York, goes to Christie's and says, we'll sign a contract. I have the art right here. It's never left the city. You nonetheless contend that this statute is not being applied extraterritorially in that circumstance? I do, as long as that person is a California resident. Counselor? Yes. I'm sorry. I'd like to ask you a question outside the sort of tax or quasi-tax area. Could California pass a statute that says every seller of hot dogs to a California resident, wherever the seller is located, has to follow certain health regulations because we want to keep Californians healthy? And could they do that and then go and try to control, you know, what's in hot dogs in Nebraska? I was going to make a joke about a Nebraska hot dog versus a New York one. But, no, that would not be appropriate, Your Honor, because you would have conflicting regulations, and that is per se problematic. Why would you have conflicting regulations? I mean, California would apply to all the different states, but what's the conflicting regulation? Because Nebraska might have a different rule about hot dogs. Sure. Presumably there are food and health codes that would apply in Nebraska. Well, New York might have to have a different rule about this, too. It happens they don't, but they could. For sure. And this is why one of the hypotheticals that's raised by the other side doesn't wash, and it's not an appropriate comparison. The only type of regulation that exists here is taking a small piece of the proceeds that come out of a successful sale. It's not attempting to impose any type of regulatory measure on any other person out of state. What's the purpose of the statute? To benefit the arts, Your Honor. To benefit the arts in California by making the state richer for artists and by having nationwide artists benefited. And, Your Honor, I'm sorry. I was just going to just quickly, because I know you want to turn this over to Ms. Feinberg, but if you assume in a hypothetical that the CRRA violates the Dormant Commerce Clause, I just assume, and that the CRRA is severable and that the CRRA is preempted by the Copyright Act of 1976, is it your position that a remand is still required because you also challenge art sales made within California before the Copyright Act of 1976 went into effect? That is true in part and also because it would still be a piece that would apply for sales within California. I'd like to add to that, Judge Callahan, the following. Let us not forget this is a facial challenge. This is 12b-6. If there's any conceivable set of circumstances under which this act can be constitutionally applied, we must be given the opportunity to do that. There is not a single case of any Dormant Commerce Clause area that was struck down at a pleading stage. They all had summary judgment or a factual record or a trial. So I think the rule about facial invalidity is particularly important here. It takes us back to S.D. Myers, one of the circuit's cases in which that rule was emphasized and where the court stated, as each of the panel members here is well familiar, that by choosing to attack an ordinance on its face, the party has the burden of showing it will have the practical effect of directly regulating interstate commerce under all circumstances. And there are plenty of circumstances. Counsel, does that affect the severability issue as well, assuming you have not persuaded us on the extraterritoriality issue? What about severability? Well, most certainly. We would still have the opportunity to go back and to respect what the legislature said, which is that if there were any piece of this that were unconstitutional, that the whole of it ought to go back. I'm sorry, that the piece that was not unconstitutional ought to go back, and that ought to happen. But I think it would be — Would we have to reach the copyright preemption argument then with respect to the other piece of it, i.e., the in-state transactions? Of course, as — I understand that you disagree with it, but I just want to know structurally. Would we have to reach it? Certainly. No, I think that that would be appropriate for remand. I think it would also be appropriate for this Court to take up. As the Court knows, Judge Snead back in 1980 upheld the constitutionality of this very act under a due process challenge and also as not being preempted as a matter of copyright law. But that, of course, is not an en banc decision. Thank you, counsel. Thank you. Thank you, Your Honor, and may it please the Court. Amy Feinberg, appearing on behalf of the State of California. Your Honor, the Resale Royalty Act raises no dormant Commerce Clause concern because it doesn't regulate sales transactions at all. It doesn't prescribe the terms or conditions of a sale. It doesn't purport to determine the terms under which or whether or under what circumstances a sale may or must go forward. Is it a tax? Ms. Feinberg, may I ask you, doesn't it impose some rather extensive administrative duties on the auction houses? They have to find out, first of all, if the owner is indeed a resident of California. Secondly, they have to find out if the painter is a United States citizen. And if he's not, they have to find out if he's lived in California for two years. It's not clear to me whether the last two years or two years at any point in his life. And isn't that a condition of the Civil Code section? Yes, it is, Your Honor. Under Section A-4, auction houses or other sellers' agents do have the administrative duty to withhold. So that's a regulation of the sale. You can't do a sale without making these administrative duties, which may be somewhat onerous. Your Honor, those administrative duties don't regulate the sales transaction itself. And that conclusion follows from this Court's decision in Gerling, where the Court held that certain information disclosure requirements don't regulate an underlying transaction. Well, information disclosure may be information that the seller or the agent has. This puts an affirmative duty of investigation on a seller, doesn't it not? It does, Your Honor, but none of those conditions purport to regulate the sale of art itself. Those conditions, when imposed on a seller's agent, define the relationship between the seller and her agent and don't define any relationship or transaction between the seller and the buyer who might consummate the transaction of the sale of art. So while there are regulatory obligations, as Your Honor pointed out, those do not regulate a sales transaction at all. They regulate the relationship between the seller and her agent. And that's a very different part of the statutory scheme at issue here. Is it a tax? No, Your Honor, it's not a tax. It does impose a financial obligation, but it doesn't bear any of the indicia that we commonly think of as being associated with the tax and that the U.S. Supreme Court considered in the Affordable Care Act case. The payments under the statute are made to a private party, not to the government, at least in the first instance. And when the royalty payments must be paid to the California Arts Council, they're not used for general revenue purposes, but rather for a specific purpose of funding art in public buildings. Does that make any difference? Hasn't the Supreme Court told us that how money gets spent doesn't define it as a tax? Your Honor, there are other indicia as well that make it clear that this isn't a tax, that the government has no collection authority under the statute. Rather, if a seller or her agent failed to pay the required royalty, the remedy is through a private right of action by the artist. And the last thing I would say that distinguishes this from a tax is that it appears in the civil code and not in the revenue and tax code. And those things taken together demonstrate that it is not a tax. Let me ask it this way. You didn't try to do this. I'm not accusing the State of California of anything. But if you designed something that was in all other respects like a tax and you decided not to call it a tax, would we not look at it under the Supreme Court's tax jurisprudence? Your Honor, there might be circumstances under which it might be a closer case, but I don't think that's true here because for the reasons that I set out, that while the label formally may not be dispositive, the other characteristics of the operation of this statute reveal that it isn't a tax. And what is the consequence of that conclusion for this case? I mean, I gather that your co-counsel or your counsel for the auction houses is of the view that he sort of wants it to be like a tax and you don't want it to be like a tax. And why is that? Your Honor, I think the primary consequence of that goes back to the bench's questions about whether this is analogous to a sales tax. And in the sales tax context, the U.S. Supreme Court has drawn very clear and in some cases somewhat artificial lines to define the incidence of a tax as occurring. You're saying that by not being a tax, there is more room for California to make these financial requirements as if it were a tax? That's correct, Your Honor. Because in the tax context, the court has defined a taxable event, typically speaking, as occurring in only one location. And that is the analysis we saw in the Jefferson Lines case. But outside of the tax context, courts have recognized that more than one state may have regulatory authority and a regulatory interest in a multi-state transaction. And that principle is seen in many of the cases cited in our brief. And so in the sales tax context, one might conclude that a transaction only occurs in one particular place to avoid the possibility of multiple tax burdens being imposed on a particular taxable event, although there could be successive taxation in the life of a product. But those taxes would be directed to different discrete events that drive toward defining an event as occurring in a single location is not the analysis that courts typically apply outside of the tax context. Counsel, you mentioned that this is enforceable by a private right of action. Does the state participate in any way in the enforcing of this statute? Do you survey? Do you do any kind of investigation? Are you following sales? Your Honor, the role that's assigned to the state under the statute is if after 90 days the seller or the seller's agent are unable to locate the artist, they must make the required royalty payment to the California Arts Council. Then the responsibility lies with the California Arts Council to locate the artist and pay him or her. And if after, I believe it's seven years. Well, let's suppose that information is never communicated to the state. What happens then? Is the state in a position to follow up on its own? Your Honor, I don't know if outside of this particular statute there's some sort of general enforcement power that a state official might have to enforce laws, generally speaking. I'm afraid I don't know the answer to that question. But with regard to this particular statute, there is no enforcement mechanism or enforcement power especially assigned to the state in the context of this particular statute. Would you speak to the question of severability? Yes, Your Honor. The California Supreme Court in the California Redevelopment Agency case said that when there is a statutory provision providing for severability, as there is here, there is a presumption in favor of severability. So the burden lies with defendants to show that the legislature would not have enacted the law absent the potentially invalid applications. So did the district court refuse to sever the statute because it found that the legislature would not have intended to drive art sales out of California? So, I mean, in other words, the district court believed that the severed statute would be a bad idea as a matter of policy. Does the state disagree? Yes, Your Honor, we do. There's no evidence in the legislative history that would suggest the legislature would have preferred no law to one that was confined only to any applications that the court would consider unconstitutional. Now, of course, our position is that all applications of the statute are constitutional. But were this court to disagree, there's nothing in the legislative history that suggests that the legislature would have preferred no statute over one in which any unconstitutional applications were disallowed. In fact, wasn't the severance provision added to this legislation after people raised questions about whether the legislation might affect it, might run afoul of the Dormant Commerce Clause? Yes, it was, Your Honor. So that suggests the legislature knew there might be a problem but still wanted the severability. That's exactly right, Your Honor. And the only evidence that the auction houses have pointed to in the legislative history in support of their position against severability is a letter from a single professor that was authored, that was mailed to or addressed to three members of the legislature. And under California law, that letter can't even be considered because it does not evince the intent or doesn't reveal the intent of the legislature as a whole. But even if we were to consider it, the most we can say about it is that three legislators were apprised of the concerns of a third party. That doesn't say anything about what the legislature had in mind when it added the California resident language. And the sources of legislative history that are relevant here, those show that what the legislature had in mind when it added the California resident language was to expand the scope of the law to cover not only the auction houses, galleries, and museums that were subject to the law in the assembly-passed version of the bill, but to make sure that the law covered private sales as well. So the suggestion that the California resident language was intended to, as the auction houses suggest, prevent the art market from fleeing California finds no support in the legislative history. Could New York enact a similar royalty statute in the hypotheticals we gave you before where the sale took place in New York? Yes, Your Honor, it could. And if there were 20 sellers or if the resident, if people resided in 20 states, could each state enact a 5% royalty? Your Honor, yes, each state could enact a similar royalty law. As we know here in the 40-plus years that the law has been on the books, no such, no state has enacted a similar law. But that's sort of a circular thing, perhaps the reason they haven't done it, just because of these constitutional problems. Your Honor, I don't know the reason that they haven't, but that doesn't undermine the policy judgment made by the California legislature. But you address what Healy references in this regard, and that is a concern that you would have the potential for inconsistent legislation. So what happens, for example, if instead of New York enacting the 5% law, New York says, well, in honor of the for sale doctrine, we prohibit any additional deduction from the terms of sale with respect to fine arts. Isn't that precisely what the Supreme Court was concerned about in Healy, is that you get multiple, you have the potential, you don't have to have the potential for inconsistent results in this kind of a situation? Your Honor, the language in Healy does speak of the possibility of inconsistent regulations applying to a particular entity. But as this Court said in S.D. Myers, no case that I'm aware of and that the Court was aware of in S.D. Myers, there is no U.S. Supreme Court decision striking down a law as per se invalid under the extraterritoriality principle, based on the possibility of a hypothetical conflict in the future. And were other states to enact laws that were inconsistent with this, or duplicative with California's enactment, auction houses or others regulated by the law would be free to bring a challenge based on pike. And that would be one of the things that the Court would consider in that context, in which the U.S. Supreme Court has repeatedly considered in cases involving, for example, transportation regulation, where train companies or trucking companies have said, this particular state law is subjecting me to the possibility of inconsistent regulation. And the U.S. Supreme Court and this Court in the Union Pacific case have analyzed that under the pike balancing test. And an auction house or other individual or entity subjected to the law here would be free to do that here as well, if such inconsistency arose.  Thank you, Your Honor. I'll give you some time for rebuttal. May it please the Court. Deanne Maynard, and joined by Howard Comet for Sotheby's, and also Jason Russell, who represents Christie's, and John Dwyer, who represents eBay. Christie's and eBay have ceded their time to me. The District Court correctly held that the Resale Royalty Act is a per se violation of the Commerce Clause. On its face, by its very terms, it purports to regulate transactions wholly outside California, where the only hook is that the seller is a resident of California. The Act requires that any time the seller is a resident of California, either the seller or the seller's agent must withhold 5% of the gross proceeds of the sale, track down the artist, and pay the withheld amounts to the artist. Counsel, does it matter that the defendants in this particular case all have a California connection? No, it doesn't, Judge O'Scanlan, because the nexus only matters once you've established a valid obligation. Here there is no valid obligation. So if the agents weren't involved here at all, right, if this were just a sale by a California resident in New York, California can't regulate that sale. Well, there could be a valid obligation if the extraterritorial part were severed. You're not contending that the statute is in violation of some provision to the extent that it deals with sales within California, are you? Oh, I'm sorry, Judge O'Scanlan, if I misunderstood your question. So if the extraterritorial part were stricken and the court severed, which we don't think the court should sever, and I would like to address that, but if the in-State, if it remained an in-State only issue, then there are other claims we have, including the copyright preemption issue and a takings claim that is not on appeal. But only if it's severable? No, Your Honor. Thank you. So the takings claim, which we raise in the district court, would have an appeal. The copyright preemption claim, which we have appealed, those would alleviate the need to reach the severability issue. Those would strike down the statute in total for different reasons. Well, would your Dormant Clause analysis be different in this case if the CRA imposed a sales tax on a California resident's sale of his or her artwork at auctions held outside of the State? I mean, wouldn't striking down a tax like that seriously undermine a State's ability to impose sale taxes in this era of e-commerce? If it were a sales tax, Your Honor, that would be a violation of the Commerce Clause. The Supreme Court has been quite clear in Jefferson Lines, the Oklahoma Tax Commission case, and others, EVCO, that sales tax, McLeod is a sales tax case, EVCO is a gross proceeds tax case, but they both are similar. They're both taxes upon the total of the sale. When those occur outside of a State, the – California would have no ability under the Commerce Clause to tax those sales. So the plaintiffs want to make a tax analogy. The State, in its brief to this Court, its only defense of the statute was to make a tax analogy. It's somewhat running from that here. But if this is analogized to a tax, it is – that just confirms that it's unconstitutional. So why do you resist the tax analogy? We embrace the tax analogy. Your brief sort of resisted it. You're embracing it now. Well, I think that either way, whether one applies the dormant Commerce Clause cases that apply to regulation of commerce outside a State, this is – this fails because you look at the transaction and where it occurs and auctions in New York occur in – wholly in New York. Or whether you look at it as a tax, then it fails. I mean, I think that in some ways the tax analogy more than confirms its unconstitutionality, if that's possible. Because the State couldn't even do this to take revenue for its own purposes. It certainly can't do it to require us to pay – search and pay third-party artists, some who may have no connection to California. Counsel, that makes it seem less like a tax and more like a regulation because it requires the seller or the seller's agent to undertake a lot of activities that Judge Baya was describing. And the money is ordinarily not paid into the coffers of the State, which is also – would be unusual for a tax. What is your response to opposing counsel's argument that the key in Healy is the word wholly, that once you have a California resident on one side of the border, that makes it not wholly in another State? The fact that someone is a resident of a particular State is not the right inquiry. The question for extraterritoriality is where does the regulated transaction take place. And here, by its terms, this is not – to take issue with the State's argument, this is not a statute that regulates any relation between the auction houses and the seller. This is a statute that on its face, by its terms, regulates only the sale. And Judge Wynn correctly – sorry, Judge Britten. Well, do you – are you looking at the Healy – in Healy – I mean, in one view of Healy is that it wasn't directly regulating an out-of-State transaction. That there's a sort of a second problem, which is this practical effect problem. So did we have to get into this whole dispute about whether Healy applies to prices – more than prices – or are we sort of one step even before Healy? I think – we think, Your Honor, that you're one step before Healy here. I agree with you that Healy is a practical effects case. This is not that. This is an easier case. This is a case – I mean, this is a very rare statute where a State is purporting to regulate a transaction that occurs wholly outside the State. Just a step back.  The entire transaction occurs outside the State. That's what the Supreme Court looks at in Baldwin when we transact. So to answer your question, Judge Razon, we think there are two reasons why you don't have to resolve the Healy pricing issue here. One is this is not a practical effects case. This is a on-its-face, this purports to regulate a transaction wholly outside the State. And two, it links reality to think that imposing a 5% levy on the gross sales price will not affect the price. So what – does that tell us anything about – I mean, our Harris opinion seems to, at some point, say limit Healy to price perhaps. Does that – it would not be inconsistent with that statement in that context, right? Which was a practical effects context. To just skip that here. We wouldn't have to do anything to Harris to do that, right? I agree with that, Your Honor. To rule for us, you would not have to deal with that statement in Harris one way or the other for the two reasons that I said, which is this is an easier case than that. We're not a practical effects case. We're an actual explicit regulation of out-of-State transactions. And two, this is really a regulation of price by requiring 5% of the gross proceeds to be paid. If I may. Well, do you think – do we – is there a problem with Harris and Corey, two Ninth Circuit cases? We have no view on the bottom line answers in those cases, Your Honor. The question that the court posed in its order regarding whether or not this case should be held en banc pointed out two statements in those cases. For the reasons I was just discussing with Judge Berzon, I don't think the court has to resolve any tension there to rule for us here. If the court does reach that issue or feels like it needs to reach that issue to rule for us here, I do not think it is a correct statement to limit the Dormant Commerce Clause to pricing only. The Commerce Clause – I mean, the Commerce Clause itself applies beyond price, and therefore, States can violate its strictures by doing things that regulate things other than price. The court's – Harris cites the Supreme Court's decision in Walsh. I think the best reading of that paragraph in Walsh is that the court is addressing the rebate program there – the Supreme Court is addressing the rebate program there and saying the rebate program at issue, at least on the record the court had on its preliminary injunction appeal, did not have the kind of outside-the-State effects that the court had found problematic in here. So are you asking us, though – I understood previously that you were saying that we didn't have to deal with severability because you would win by preemption of the Copyright Act? Did you say that? I did say that, Your Honor. You know, to pick up on the question that you asked opposing counsel, we believe – so there's – I would like to address both of those things. Well, I guess I gave him the – maybe I gave you the same hypothetical, that the CRRA violates the Dormant Commerce Clause, that the CRRA is severable, and that the CRRA is preempted by the Copyright Act of 1976. Isn't a remand still required because the plaintiffs challenged some art sales between Made in California after the enactment of the CRRA on January 1, 1977, but before the enactment of the Copyright Act of 1976 on January 1, 1978? So you have a year in there. I think there are two possible ways to deal with that, Your Honor. We believe that this Act is preempted by the Copyright Act of 1976 for two separate reasons, both conflict preemption and express preemption. Morseburg, this Court's previous panel decision, dealt only with the 1909 Act and dealt only with conflict preemption, not the express preemption provision. I think that the Morseburg holding has been passed by, by subsequent Supreme Court precedent. Well, if we're following your line of reasoning, then would you be encouraging us to not affirm Morseburg v. Bailyn? I do think that Morseburg v. Bailyn does not withstand current Supreme Court reasoning on the first sale doctrine. Why isn't this an added or extra element, as they put it in the copyright law, that would then save it from preemption? And is this a legal issue for this Court to decide if we need to get there, or is there some additional evidence that would be needed to parse whether it is this additional element? There is no additional. I think it is a legal question. I don't think that the CRA creates any additional legal element of the kind meant by this Court's test for preemption. The CRA simply creates additional exclusive distribution rights. Those are rights equivalent to those covered by the Federal copyright statute, and therefore, under the express preemption provision, should fall. You know, the fact that one can point to different elements, as the other side does, is not dispositive. The question is whether the right that's given is similar to the, is equivalent to the rights given by the copyright statute, and they clearly are. The rights given by the copyright, Federal copyright statute are, you know, the exclusive rights to distribution and the amount, the ability to control that and receive funding for it. And this gives the same exact kind of right. Did the district court deal with the copyright issue? The district court did not reach the copyright issue, Your Honor, because she resolved the case on the Commerce Clause grounds. But she also held the statute had to be struck down in its entirety as applied to us, and so therefore did not reach the Copyright Act. I understood the basis of Judge Callahan's questions to be perhaps she was inclined to hold the statute severable. In my hypothetical, I said that it was severable. Yes, Your Honor. Thank you. You did understand my hypothetical. I did. I'm sorry. I didn't mean to accuse you of stating a position. If we agree with that, that it is severable, shouldn't we let the district court take the first crack at the copyright issue? Well, one, obviously, that's within the discretion of the court. We fully briefed that issue on appeal. It's particularly well suited to en banc resolution now that you're here, given that there is this previous panel decision that I think has been passed by, by Supreme Court precedent, and this Court would be particularly well suited to reach it as an en banc panel. Could you explain then why, I won't call it an added element, why this resale royalty arrangement, why it's tantamount to the distribution provisions of the, I think it's 106 of the copyright law. Because the 106 grants the original owner of the copyright the right to distribute the work, the right to get remuneration for that distribution. But, counsel, here you have an exemption from the law for the initial sale by the artist, right? That's true, Your Honor. So let's take a sculpture that is a one-off sculpture. The artist has a copyright in that and sells it to you. What distribution right does the artist retain in the sense of allowing you to resell it? Don't you have the unfettered right to resell it without violating the copyright law? It's not the unfettered right that the first sale doctrine of federal copyright law should give me. So under the first sale doctrine of federal copyright law, I should be able to sell it with no strings attached, with no obligations to anyone. But this act would require me upon the resale, if I sold it for more than I purchased it for, to pay 5% of the gross proceeds to the artist. Under the federal copyright law, the artist is supposed to get all they can get for it on the first sale. That's the balance that the federal government has chosen. But to whom? It's hard to say when we say you because it's hard to know, are we saying you the lawyer personally or are we saying the auction house? So if a work is sold to an individual and then the individual sells it, and the individual then has a right of, you know, the first sale doctrine, the individual can sell to whomever, correct? That's right. No restrictions. So the individual says, well, I think I'll sell to this little gallery in New York. No restriction on the sale to that gallery, correct? Well, if the law, are you trying to, are you setting a hypothetical where the law is not triggered? The sale is triggered, I mean, the action is triggered by the gallery, not by the seller, the individual seller, correct? So let me just clarify. When I was speaking before, I understood the hypothetical to be me as a person. I owned that art, so I was talking about me personally. Okay. Now you sell it to a little gallery in New York. Now if the person sells it to a gallery and in such a way that the Resale Royalty Act obligations are triggered and that they must find the artist and pay 5 percent to the artist. Who's they? Sorry? The gallery. Oh. No. Under the Resale Royalty Act, the seller. The seller. Who had bought it free and clear from the artist and under the federal copyright laws should therefore be able to sell it with no restrictions on alienation to anyone they want with no strings attached. The California Resale Royalty Act attaches strings to it. What's strange about it, suppose the regulation was a regulation, a monetary regulation on the first sale. That is anybody who sells a painting in California has to pay at least $10 for it. Is that a copyright violation? It's the original sale. The original sale. Adding additional royalties to the original copyright. Well, yeah. I mean, in other words, is the price of a sale of a work covered by a copyright regulated by the Copyright Act? The original sale, that may or may not, Judge Rizan, but it's different than the problem here. But all you're doing essentially is so that if you projected the future price at the time of the original sale, it wouldn't be a problem. So what's the difference if you do it later? I'm sorry. I didn't mean to concede it wouldn't be a problem. It may well be a problem for California to set a minimum original sale price, but it would be a different analysis than the one here. So what the Supreme Court has made clear since this Court's decision in Morseburg in both Kurtzig and Quality King, that the first the copyright, the federal copyright statute has created a balance between the works. Right, but they don't deal with price setting of sales. There's no distribution restriction here. Go ahead and distribute to whomever you want, sell to whomever you want. So the question is, does the Copyright Act cover price regulation? I think it's passing strange to conclude that requiring someone to pay 5% of their gross sales price upon their resale is not a restriction on the first sale. Well, earlier you said it was a matter of raising the price. You said the only point of this is going to be to change the pricing structure. That was earlier in your argument. So it sounds like you're kind of switching gears between the argument under the Dormant Commerce Clause and the argument under the Copyright Act. On the one hand, you're saying it's all about price. But under copyright, you're saying, well, it's not really all about price because price isn't copyright. So which is it? I think I am being consistent, Your Honor. In both cases, it's a regulation on the resale. So in both cases, it's a forbidden regulation. So in the one case, it's a forbidden regulation on the sale outside the state of California that California lacks the authority under the Commerce Clause to do. And in the second case, it is a regulation on the resale after federal copyright law has given the purchaser the right to sell that without any restrictions on alienation. It's not a restriction on alienation. Why isn't it then similar? A New York can impose tax. Can't they impose a New York sales tax on it? They could impose, you know, assuming all the necessary. What would be the difference then of that kind of regulation imposed on the resale along with there may be a city tax as well and the royalty? There's a difference between a generally applicable tax that's lawful, that applies to a sale, and California passing a statute that undermines the federal for sale doctrine by requiring terms of the resale. Okay. I understand that you say there's a difference, and I'm trying to understand it. I understand what a tax is in general, but I'm asking you in the context of the Copyright Act, what is the difference between that kind of regulation that is imposed on a resale and the royalty imposed on a resale? And I think one way to think about it is under the federal copyright law, once the artist has sold it once, that exhausts the artist's copyright rights in the article, and the owner owns it. California is now trying to come in and tag the art with a restriction that flows with the art such that if the person chooses to sell it, they have to find the artist, pay the artist 5% of their gross proceeds, you know, if the act is triggered. Okay. So that's a preemption argument? Oh, yes. That's preemption, but you still got that one year where the first sale doctrine was not in effect here. Yes, Your Honor. But I think that we have two preemption arguments that we've made in our briefs. One is an express preemption under the 1976 Act, and one is conflict preemption. Conflict preemption is what this Court addressed in Morseburg, and I respectfully suggest that time has passed Morseburg by, and that is incorrect. And so if one were to reverse Morseburg on Blanc, as this Court is free to do, then there wouldn't be that period, and that's what we would ask this Court to do. Could I ask you about severability? Yes, please. Thank you, Judge. Because all this term, and I know you wanted to get to it, so I wanted to give you a segue into it. Let me pose the difficulty for you that the severability argument gives me. There's a severability provision in the statute. It's possible mechanically to sever provisions here, and California cases tell us we presume severability. The district court said, well, I don't think the legislature would have wanted to do this had it only affected California transactions. But at least in the chronological history, they were aware of a dormant commerce cause issue and then added a severability provision. Why doesn't that lead me to think that this ought to be severable? Because, Your Honor, one thing about the record. The legislative counsel's memo stating that this would be a dormant commerce cause problem and the addition of the boilerplate severance provision occurred on the same day. So it wasn't that one was after the other, if I can grab that. Well, and I take your point. They occurred on the same day. But I attribute knowledge to legislators. Maybe that's a wrong thing to do, but I attribute knowledge to them that they were acting simultaneously with knowledge of what their counsel had recommended to them. Well, I would suggest that there's nothing in the record to indicate that they did know, and given that they were on the same date, it seems likely to me that they didn't know, especially since when the severability provision was added, it was added with several other things that sort of said this is kind of a housekeeping measure. So there's nothing to suggest that they added it because of the legislative counsel's memo. But nonetheless, the legislation proceeded thereafter with a severability measure on it, and at least the people who voted on it after that are presumed to have knowledge of what the counsel did. It did, Your Honor. But, you know, as this Court recognizes recently as yesterday, the severability provision is not alone enough. The California courts still go through the analysis about whether or not it's volitionally severable, and here it isn't. Here, when you look at the history of the legislation, the Assembly passed a bill that was a California-only bill. That made its way to the Senate, and in the interim, the legislature was warned by Professor Merriman that this would drive, a California-only bill would drive the art market out of the state. And then they added the provision that we're challenging here. So why do we, how do we conclude that they acted on his advice as opposed to, for any number of other policy reasons, for example, much greater protection for artists to make this nationwide? It's the only explanation in the record for the change between the Assembly bill and what ultimately passed was this warning that it would drive the art market out of California. So the standard that this Court is to apply for severability, even when there's a that the legislature would have passed a California-only bill. What would Justice Scalia say about your argument on this legislative history? Well, Justice Scalia does consider legislative history as it passes, you know, as it passes through. He doesn't take, he might not look at the Professor Merriman letter. I'll grant you that. But he would, but I think he would be interested in your whole Dormant Commerce Clause argument. Yeah, that's right. That's true. If you had him, you wouldn't have to make the argument. Justice Scalia actually applies the Court's current precedence on the Dormant Commerce Clause. And the, and so he does write separately often to say that's what he's doing. But I believe that under the current precedence, this is a violation of the Commerce Clause. And, in fact, this is a striking violation of the Commerce Clause. And so I would hope that Justice Scalia would agree. Let me ask you a little bit of a follow-up question to these other questions on severability. When we look at the legislative intent or try to determine whether the legislature would have passed this as a California sale statute, doesn't that still end up protecting a lot of artists, in fact? And wouldn't the legislature still have wanted to do that? And otherwise, why did they include a severability provision? Well, I think that goes back to the same line of questioning. I think the severability provision was included as a housekeeping amendment on the same day that they were warned this was unconstitutional. It isn't, I don't think this Court can say with confidence, which is the relevant standard, that they would have passed a California-only bill. It isn't at all clear that a California-only bill would protect more artists if it drove the art market out of California, which is what they had been warned. Finally, it's whether they believed it was going to drive the art market out of California. That's obviously a debatable question. Being a debatable question, they might well have said, well, if we can't have one, we'll have the other, and we'll see what happens. So where's the real question is, how is the Court supposed to decide this? Well, I think given that the standard is this Court has to conclude with confidence. Does the with confidence standard apply when there is an express severance  Yes, it does, Your Honor. I thought there was a presumption that the legislature wanted severance when there was an express presumption clause. The California Supreme Court does state that when there's a severability provision, but then it goes on to apply the volitional test in the same way. And I would point the Court to the hotel employees case that we cited in our brief, which is the California Supreme Court case. Indeed, this Court just yesterday in Vivid Entertainment stated that. But that would mean that the clause was irrelevant, right? If we had the same test with or without the clause. It's California law, so perhaps that's what it is. But we'd have the same test with or without the clause, under your view, wouldn't we? Perhaps it provides more teeth to other pieces of it. But the California courts, as I read them, they apply the same test and they ask, can the Court conclude with confidence? And I think, Judge Berzon, back to your question, if it could go either way, it's hard to see how you can conclude with confidence that they would have wanted a California only law. Counsel, I have a question about eBay. Is eBay identically situated with your other two clients with respect to this appeal? Well, Mr. They made a slightly different argument, as I recall, earlier. Mr. Dwyer is here and can address any specific questions you have with respect to eBay. But I think on the Dormant Commerce Clause issues here and the copyright preemptions, we are equally situated in the sense that there are sales that occur outside California on eBay every day. Very well. Any further questions? Thank you for your argument. Thank you. We request that you affirm. We'll give you five minutes. Thank you, Your Honor. Your Honors, there is no regulation of a transaction. There is no regulation that deals with the point of sale. What this does is it takes a part of the revenue received with a profitable art sale, and in that respect, it's like a tax. But it is fundamentally, and this has fundamentally been our argument from the first, a regulation. And as such, when we apply Healey and we ask ourselves, is this a transaction that is wholly outside of California, the answer has to be no. I don't mind about my question about whether we're not even pre-Healey here, i.e., that Healey is a practical effects case and this one is a direct regulation of an out-of-state transaction. By my count, Your Honor, there have been only three U.S. Supreme Court pressings. That may be true, but nonetheless, because they're all in the second category, probably because the first category is so obvious. And as to the first category, i.e., when you're directly regulating an out-of-state transaction, the case law does speak in the alternative, direct or practical effect. And all the cases are practical effect cases, but this one seems to be before that. It's a direct regulation. I'm not sure that I'm with Your Honor on that. I think fundamentally Healey really is a discrimination case. But when we get beyond that and we look at the language, directly regulating. Well, it didn't purport to be doing that. It said it was regulating the sales in state, but in a way that was likely to lead to or could lead to changes because there were two ways to respond to it, either to change the in-state price or to change the out-of-state price. Yes. But it wasn't purporting to change the out-of-state price. Your Honor, I think it's an expansion. I think it takes Dormant Commerce Clause cases beyond where the Supreme Court has been to the point about where Justice Scalia would be on this. There's no question that this is beyond where the Supreme Court has been, and it's well beyond where this circuit has been. Can you explain, Mr. George, why you say it is not a direct regulation? It's not a direct regulation because it doesn't change any aspect of the art sale. All it does is take 5% of the proceeds received by a California resident at the end of the day. It doesn't affect price, conditions, location, anything at all about it. But it affects the allocation of the proceeds of a sale. Yes. So it would seem to me that if California had a whole lot of favorite charitable causes, then you could say, well, 5% to the artist and 5% to, you know, against cruelty for animals or whatever, and pretty soon the seller would get 50% of the proceeds of the sale. Why isn't that a direct regulation of the transaction? I think that at best, Your Honor, maybe that gets us to a Takings Clause type of issue, but that for purposes of Dormant Commerce Clause, there have been situations where there have been businesses regulated where they've had to pay monies, most recently in the pharmaceutical research case, where there were monies that were required to be paid for purposes of complying with an Alameda ordinance with regard to the disposal of pharmaceutical products. That was held to be constitutional. And, Your Honors, all of the recent cases by this circuit have made clear that with respect to many pieces of California legislation, ranging from the California Equipment Dealers Act to animal rights issues to carbon credits, that these have not been improper direct regulations, and I think that the art statute at issue here is even less so. I really would like to conclude on the point about this being a facial challenge. The law seems so crystal clear that if there is any set of circumstances under which this law can be constitutionally applied, that there should be no question but that we have a remand for purposes of assessing the burden. Does this satisfy the Pike Balancing Test? We submit, Your Honors, that it does. We can even conjure situations where there are in-state sales, private sales, not auctions, maybe online sales, where the nexus to California is even more than having a California seller and a California buyer. Thank you, Your Honor. Thank you, counsel. The case is heard. It will be submitted for decision. Thank you all for your arguments, and we'll be in recess.
judges: Thomas, Pregerson, Reinhardt, O'scannlain, Silverman, Graber, McKeown, Berzon, Callahan, Bea, Hurwitz